M

## IN THE MATTER OF THE ARBITRATION BETWEEN

GLENDA PEREZ,

          Claimant,

   v.

CIGNA HEALTH & LIFE INSURANCE
CO.,

          Respondent.

Case No. 01-17-0004-5405

## RESPONDENT'S MOTION FOR SUMMARY JUDGMENT
## AND SUPPORTING MEMORANDUM OF LAW

Respondent, Cigna Health and Life Insurance Co. ("Cigna" or "Respondent"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully moves for summary judgment in its favor on all claims asserted in the Amended Complaint (the "Complaint") of Claimant Glenda Perez ("Claimant" or "Ms. Perez") and, in support, states as follows:

### I.    INTRODUCTION

In her Complaint, Claimant alleges that Cigna violated: (1) Title VII of the Civil Rights Act of 1965 ("Title VII"), the Florida Civil Rights Act ("FCRA"), and 42 U.S.C. § 1981 ("1981")[1] by discriminating against her because of her race and/or national origin

---

[1] Claimant's claims of both discrimination and retaliation are analyzed using the same framework under all three statutes that she invokes. *See, Sledge v. Goodyear Dunlop Tires North America, Ltd.*, 275 F.3d 1014 (11th Cir. 2001); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318 (11th Cir. 1998) (applying *McDonnell Douglas* and Title VII analysis to claim raised under 42 U.S.C. § 1981 for alleged national origin (Hispanic) discrimination.); *Shedrick v. District Bd. Of Trustees of Miami-Dade College*, 941 F.SUpp.2d 1348, fn. 7 (S.D.Fla. 2013) ("Because the FCRA was patterned after Title VII, it is interpreted in accordance with those decisions construing Title VII and thus a separate analysis of FCRA claims in a Title VII action is not required."); *Page v. Winn-Dixie Montgomery, Inc.*, 702 F.Supp.2d 1334 (S.D.Ala. 2010) (Retaliation claims under 42 U.S.C. § 1981 are analyzed in the same manner for summary judgment as under Title VII). Thus, throughout this motion, unless otherwise specified, when respondent refers to a burden of proof with respect to Title VII, Respondent is also referring to the same burden under the FCRA or 42 U.S.C. § 1981.

(Puerto Rican / Hispanic); and (2) Title VII, the FCRA, and 42 U.S.C. § 1981 by retaliating against her.

Initially, Claimant's Title VII and FCRA claims must be dismissed for failure to exhaust her administrative remedies.

Further, with respect to her claims under 42 U.S.C. § 1981 and even if Claimant had exhausted her administrative remedies, as discussed herein, Claimant is unable to establish a *prima facie case* of either discrimination or retaliation under Title VII. As to discrimination, Claimant cannot identify any similarly situated employees treated more favorably than she was. As to her claims of retaliation, Claimant cannot present evidence that she engaged in a protected activity and cannot establish that any protected activity was causally connected to the complained of adverse employment actions. Additionally, even if Claimant could establish a prima facie case of discrimination or retaliation, which she cannot, Respondent is unable to show that the reasons for her termination (failing to meet performance standards set forth in a corrective action plan including reducing errors and taking accountability for errors) were a pretext for discrimination or that the retaliation was the "but for" cause regarding her termination. Ultimately, Claimant fails to raise any triable issues of disputed fact regarding the circumstances of her employment and termination, and, as such, Cigna is entitled to judgment as a matter of law.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS[2]

### A.   IMPLEMENTATION SET-UP REPRESENTATIVES AT CIGNA.

Cigna is a global health services organization that partners with clients (often corporate employers) to ensure that health goals of the clients are met particularly with respect to benefit offerings for employees. One type of health benefit plan that Cigna works with employers to provide for their employees is a pharmaceutical benefit plan. As part of

---

[2] These "facts" are taken as true *only* for purposes of this motion as required pursuant to Fed.R.Civ.P. 56.

being able to provide these pharmaceutical plans, Cigna employs Implementation Set-Up Representatives ("ISRs"). (Dec. of V. Ponton, ¶4 – Exhibit A.) An ISR is responsible for keying data into a computerized system that interfaces with pharmacies allowing the pharmacies to correctly charge consumers attempting to fill prescriptions according to the terms of the plans that Cigna's clients provide to their employees. (*Id.* ¶5; Deposition of G. Perez, pp. 39 – 42 - Exhibit B.) Generally, an ISR is assigned certain client accounts to work on and certain benefit plans for the client to update as new plans are added, taken away or updated according to client preference. (Ex. A., ¶10; Ex. B., pp. 43 – 46.)   The ISR then reviews the client preferences and physically keys different "logics" into a computer system that will allow the benefit plan to operate smoothly for the client's employees.  (Ex. A., ¶5) For example, if a client wants to change its deductible amount for all drugs under a certain plan, that information will be relayed to an ISR who will go into a computerized system and will update the appropriate logic within the computer code so that the client's employee will then be charged the new deductible the next time he or she buys a prescription drug.

**B.    CLAIMANT'S EMPLOYMENT WITH CIGNA.**

On October 7, 2013, Claimant was hired by Cigna to work on implementation of pharmaceutical benefit plans for Cigna's clients in the position that is now known as an ISR. She began working out of the Bloomfield, CT Cigna office and was eventually granted the opportunity to work from home.  She had the same job responsibilities the entire time she was with Cigna.  (Ex. A., ¶7.)

From the beginning of her employment through 2016, Claimant's performance was acceptable if not slightly above average. (Ex. A., ¶7.)   By 2016, Claimant was one of the more senior ISRs and was trusted with more complex accounts.  (Ex. A., ¶11.)

3

## C.    CLAIMANT'S PERFORMANCE ISSUES.

In 2016, Claimant had been placed on a verbal warning for attendance issues pursuant to Cigna policies regarding taking excessive PTO. (Ex. A., ¶7.) Still, prior to 2017, Ms. Perez had always been a solid performer who was willing to help with special projects and assist new ISRs learning the coding functions necessary to work as an ISR at Cigna. (Ex. A., ¶7.)

### 1.    The AON Account.

In March, 2017, Ms. Perez was assigned to update a significant complex account ("AON") that she had worked on quite a bit. (Ex. A., ¶11.) In working on that account, Ms. Perez attempted to update an issue that she identified as having been previously coded incorrectly that would affect whether a consumer using the plan would have to pay a differential or penalty for a name brand drug when a generic was available. The client had wanted the plan to apply that penalty, but Claimant noted that the existing coding would not require people under the plan to pay. (Ex. A., ¶16; Ex. B., pp. 77 – 78.)

However, Claimant missed a very basic step in attempting to fix the problem she identified, which included ensuring that the "deductible ID" was not tied to additional accounts[3]. (Ex. A., ¶12.) Claimant even admits in her deposition that she did not take this step in this instance. (Ex. B., p. 143.)

Once identified, Claimant was asked to fix that error as is typically done with an ISR makes such a mistake. However, in "fixing" the error, Claimant actually made another error which if made alone would have been a minor careless error. However, this additional error compounded the first actions taken and actually changed the amount that a consumer would

---

[3] If a field in a computer code is "tied to" multiple accounts, when it is changed in one place, it changes the same field in all fields "tied to" it. Thus, if one field is updated for a certain client and the same field is used for other clients, it will change the field for all clients using that field. Thus, ISR's are trained from day one, as a basic fundamental step of making any change in code, to ensure that the field is only tied to what the ISR wants to be changed.

have to pay for certain drugs across over 100 plans for not only this client but other Cigna clients. (Ex. A., ¶13; Ex. B., p. 87.)

After management learned that this second error occurred and impacted other Cigna clients, Claimant had a conversation with both her direct supervisor and the "tech coach" (Heather Fago) who was to assist all ISRs in technical coding concerns. (Ex. A., ¶15; Ex. B., p. 87.)   After talking to the tech coach and another Cigna manager who was in charge of the original account (the PIM), Claimant was asked by the PIM to "undo" what she had already done and to essentially start over fixing the original account per the client's request. This time, in Claimant's second attempt to fix the account, she once again, made a careless keystroke error. (Ex. A., ¶17.)

In discussing these errors with Claimant, her supervisor, Valery Ponton took note that Claimant did not take the issues seriously and laughed off the error as a simple slip up. (Ex. A., ¶18.)  In fact, in deposition, Ms. Perez continued to characterize this error as no big deal. (Ex. B., pp. 147 – 148.)  Ms. Ponton was alarmed that such a senior ISR not only had made these three careless errors but also did not appear to have the drive or desire to take it seriously and fix it for the client. (Ex. A., ¶21.)

At this point, because the client was being impacted and Cigna wanted to make absolutely sure that no other errors were still present in this client's accounts, Cigna pulled five other ISRs off their own production and had them, along with Claimant, work full time for over a week, to go through the account and fix, check, double check and triple check each option for the account.  (Ex. A., ¶19.)   Additionally, Ms. Ponton engaged in a verbal counselling with Claimant as a way to address the careless errors and make Claimant aware that the mistakes, while not unusual mistakes in and of themselves, in the cumulative and given the circumstances were serious and that she needed to take accountability to do better. (Ex. A., ¶24.)

5

**2.      The Performance Corrective Action Plan.**

During the "clean-up" period after the original error in the AON account, including the multiple attempts to fix the original mistake made by Claimant, Ms. Ponton engaged in several conversations of coaching and guidance with Claimant including one in late April where she expressed that Claimant would be on a verbal warning regarding these errors. (Ex. A., ¶25, Ex. B., pp. 147-148.)   On May 23, 2017, Ms. Ponton finalized her decision to place Claimant on a formal Performance Corrective Action Plan ("PCAP") as a tool to help ensure that Claimant was still focused and performing up to the level that she was capable of performing.  (Ex. A., ¶27.)   She made this decision due to the multiple attempts it took to correctly code the account, the continued errors that compounded one another, the evident lack of effort to care that the mistakes were made or to get better, and the lack of accountability shown by Claimant. (Ex. A., ¶28.)   Per the PCAP, Claimant was to be placed on a process called "gatekeeping" whereby she would be required to have all of her work reviewed by the tech coach for the next 30 days so as to ensure that any gaps in training or knowledge could be provided.  (Ex. A, ¶28.)

During the conversation when Ms. Ponton explained the PCAP to Claimant, Claimant testifies that she told Ms. Ponton that "I feel like I'm being discriminated and used as a scapegoat." (Ex. B., p. 185.)  Claimant then explained this comment by stating that she told Ms. Ponton that she wasn't going to sign the PCAP or be subject to it and wanted to HR to intervene because she was concerned that the gatekeeping process was not confidential. (Ex. B., p. 187-188.)

**3.      Claimant's Speakeasy Process and Complaint of "Discrimination".**

Cigna maintains a strict anti-discrimination policy and a no retaliation policy that it enforces vigorously. (Ex. B., p. 59, Ex. 3; p. 60, Ex. 4.)  As part of its policies, which employees are trained on annually, employees are encouraged to raise any concerns of

discrimination or retaliation at any time.  One way that employees can raise these concerns is through a process called a "speakeasy" whereby an employee can call a toll free number and raise a complaint that will be assigned and investigated by a member of Cigna's Employee Relations ("ER") team.  (Ex. B., p. 61, Ex. 5.)

Claimant called and engaged in the speakeasy process the day after receiving her PCAP and that complaint was assigned and investigated promptly by Cigna. (Ex. B., p. 170, p. 176, Ex. 37).  During her conversations with the ER representative who was investigating her concerns, Claimant testifies that she mentioned that she felt that the PCAP was "discrimination."  (Ex. B., p. 202.)  Notably, however, Claimant admits that she did not describe what type of discrimination she felt she was being subjected to and that she never mentioned the words race, national origin or Puerto Rico at all.  Claimant admitted that she did not complain specifically of national origin or race discrimination because she had a hard time expressing this but that, instead, when she said the word "discrimination," Cigna should have known that her complaint was about national origin.   Claimant's testimony regarding her "complaint" of discrimination is as follows:

Q.      And did you ever tell anyone that you believe that you were discriminated against because of your race, because you're Hispanic?

A.      Karen King.

Q.      You told her you felt like it was discrimination because you're Hispanic?

A.      Because I was discriminated against.

Q.      Did you say because I'm Hispanic?

A.      No, I didn't say I'm Hispanic.  I said, I'm being discriminated against.   What do you mean?  How do you feel or what do you feel that this is happening to you.

Q.      And you didn't say it's because I'm Hispanic?

A.      No.

7

Q.    She asked you why – what your feelings are as to why it was happening to you?

A.    Yes.

Q.    And what did you describe?

A.    The PCAP, no evidence was given to me.

(Ex. B., p. 202.)  Thus, the only record evidence, taken in a light most favorable to Claimant, suggests that Claimant used the word "discrimination" on two occasions – once on May 23rd to Ms. Ponton and once in a conversation with Ms. King over the next few days.  In both conversations, she also explained that her comment that she felt that she was being "discriminated [against]," was based on the fact that the PCAP was given to her and/or that it was not confidential.  There was, at no time, any comment, even according to Claimant, suggesting that she felt that she was being treated unfairly because of her race or national origin.

Further, it is undisputed that during the investigation, Cigna interviewed Ms. Ponton and confirmed that there were performance issues that justified the PCAP.  (Ex. B., p. 182, Ex. 40.)

**4.    The Gatekeeping Process.**

After starting the gatekeeping process whereby Claimant would send her finished work to Ms. Fago for review, it became evident to Ms. Ponton and to Ms. Fago that Claimant was still making careless errors, was still not engaged and remained unwilling to accept accountability for her work. (Ex. A., ¶28.)   Ms. Fago conducted weekly telephone calls with Claimant to discuss her struggles, but only noticed continued pushback and inability to take responsibility or accountability in her job duties.  Claimant even admits that she continued to make mistakes and refused to perform simple tasks requested by Ms. Fago as part of the gatekeeping.  (Ex. B., pp.  226-227.)   For example, once an ISR finishes up on an account,

8

he or she always performs a "claims test" which essentially allows the ISR to enter a test environment, pretend like the benefit plan is live and run a pharmacy claim through the system on behalf of a fake consumer in order to "test" the claim and ensure that the correct amount is charged to the consumer. If the claim runs through appropriately, then the ISR can send that account onto a quality team known as "QA" to run additional quality checks.  As part of gatekeeping, Claimant was asked to send a screenshot of her claims tests to Ms. Fago so that Ms. Fago could ensure that Claimant knew that this was an essential step. However, Claimant almost never did so willingly without having to be asked.

Further, while Claimant asserts in her deposition that she did not make all the errors during gatekeeping that Cigna has record of her making, she does admit that she did make errors throughout gatekeeping.  She testified:

> Q.    Do you think that you made any errors in any of these things you submitted through the gatekeeping database?
>
> A     Some, yes.  But not all.  Some were just being nit-picked.
>
> Q     Even if they were nit-picked, do you think you didn't do them, though, the things they write?
>
> A     Yes.  I didn't do them.
>
> Q     Do you think they were getting back or do you think they were just being too picky.
>
> A     Too picky.
>
> Q     Not that they're lying on here, it's just too picky and you don't think it should have been a requirement.
>
> A     Yes.  Some of them should not have been required, definitely.

(Ex. B., pp. 226-227).  Thus, even according to Claimant, she was not doing what she was asked to do as part of the gatekeeping process and her insistence – still – that she should not have had to do what her supervisors asked her to do exhibits the lack of accountability that Cigna observed during the last few months of Claimant's employment.

9

5.      **Termination.**

Claimant and Ms. Ponton continued to talk throughout the time that Claimant was gatekeeping not only about the technical problems that were still occurring, but also about the significant communications issues that were ongoing the evident lack of accountability. (Ex. A., ¶28). After thirty days, Claimant's performance had not improved and her PCAP was extended to allow additional coaching. (Ex. A., ¶33).

While on the PCAP and engaging in gatekeeping, Claimant again worked OT without informing her supervisor exhibiting yet another example of a disregard for the rules and a lack of accountability. (Ex. A., ¶34). Finally, on July 19, 2017, while Ms. Ponton was on PTO, Claimant took her own PTO without notifying anyone. (Ex. B., p. 244). On Saturday, July 20, 2017, at 7:30 pm, she sent an email to Ms. Ponton telling her that she had an emergency the day before and that therefore she had not worked a full day on the 19th and was, instead, logging in on Saturday to make up time. *Id.*   Given all the issues that had been raised and the fact that this last event on the 20th reinforced Claimant's lack of accountability and unwillingness to abide by rules that she knew were in place, Ms. Ponton made the decision to terminate Claimant's employment for failure to abide by the terms of the PCAP including both the performance improvement and accountability piece. (Ex. A., ¶35.

### III.      ARGUMENT

### A.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, discovery, and exhibits show there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party is not required to produce evidence showing the absence of a genuine issue of material fact; rather, the moving party's burden is satisfied by showing that there is insufficient evidence to support the non-moving party's case. *Id.* at 325. The party

opposing summary judgment must provide sufficient evidence that would allow a reasonable trier of fact to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Id.* at 252. Moreover, a plaintiff's speculative testimony about the motive for an employer's actions is insufficient to create a triable issue of material fact. *See Lujan v. Nat'l Wildlife Fed'n* , 497 U.S. 871, 888 (1990) (conclusory allegations insufficient to defeat summary judgment motion). Summary judgment is not "a disfavored procedural shortcut," but is an integral part of the Federal Rules of Civil Procedure, which the Supreme Court has unequivocally endorsed. *Celotex Corp. v. Catrett* , 477 U.S. 317 (1986).

## B.   CLAIMANT'S TITLE VII AND FCRA CLAIMS MUST BE DISMISSED FOR FAILURE TO EXHAUST HER ADMINISTRATIVE REMEDIES.

It is well-settled that a Title VII and an FCRA plaintiff must satisfy the statute's administrative exhaustion requirement before filing a judicial complaint. "Prior to filing a Title VII action ... a plaintiff first must file a charge of discrimination with the EEOC and receive statutory notice of the right to sue the respondent named in the charge.[4]" 42 U.S.C § 2000e-5(f)(1); *Alexander v. Gardner-Denver* Co, 415 U.S. 36 (1974). A plaintiff bears the burden of proving that she has exhausted. *Owens v. Omni Hotels Mgmt. Corp.*, No. 1:11–cv–00699–TWT–RGV, 2012 U.S. Dist. LEXIS 57896, at * 18 (N.D. Ga. Mar. 27, 2012) (explaining that "[w]hen a defendant disputes that a plaintiff has exhausted administrative remedies or denies that the plaintiff has fulfilled the preconditions to suit, the 'plaintiff then

---

[4] Cigna recognizes that the requirement of receiving a Right-to-Sue letter is not a jurisdictional requirement but, instead a procedural prerequisite that is subject to equitable modification, for example, in the event that a plaintiff obtains her Right-to-Sue and agrees to include all claims in the existing proceeding and the defendant has sufficient time to prepare adequate defenses. *See, Forehand v. Florida State Hosp. at Chattahoochee*, 35 Fed.R.Serv.3s 911 (11th Cir. 1996). However, here, despite numerous requests, Claimant has wholly failed to obtain her dismissal and notice. In fact, Claimant affirmatively told Cigna's counsel that she intended to seek a dismissal and notice of rights. However, within a few hours of that notification, the EEOC contacted the undersigned seeking a Statement of Position.

bears the burden of proving that the conditions precedent ... have been satisfied'" (*quoting Jackson v. Seaboard Coast Line R.R.*, 678 F.2d 992, 1010 (11th Cir. 1982))). Further, claims that remain under investigation by the EEOC cannot be tried in an adjudicatory proceeding and must be dismissed. *Hillemann v. University of Central Florida*, 411 Fu.Supp.2d 1354 (M.D.Fla. 2004).

Further, prior to filing suit specifically under the FCRA, a complainant must exhaust her administrative remedies by filing a Charge of Discrimination with either the U.S. Equal Employment Opportunity Commission ("EEOC") or the FCHR *and* allow 180 days for investigation of the Charge. Fla. Stat. 7601.11(1); *Sweeney v. Florida Power and Light Co., Inc.*, 725 So.2d 380 (Fla. 3d DCA 1998) (dismissing FCRA age discrimination suit filed 20 days before the expiration of the 180 day period). Absent a reasonable cause determination from the FCHR or the lapse of 180 days, the claimant cannot pursue an FCRA claim in court. *Sheridan v. State Dept. of Health*, 182 So.3d 787 (Fla. 1st DCA 2016); *Sweeney*, 725 So.2d 380 (Fla. 3d DCA 1998); *Brewer v. Clerk of Circuit Court, Gadston County*, 720 So.2d 602, 603-604 (Fla. 1st DCA 1998). Receipt of a "Right to Sue" letter from the EEOC cannot be used to support an FCRA claim absent either the passage of 180 days or a reasonable cause determination from the FCHR. *Sheridan*, 182 So.3d at 793 ("[T]he EEOC's right-to-sue notice cannot operate to circumvent the administrative perquisites of the FCRA."). Indeed, although the FCHR has a work-sharing agreement with the EEOC, it nevertheless retains jurisdiction over FCRA claims. *McKelvy v. Metal Container Corp.*, 854 F.2d 448, 452 (11th Cir. 1988). As such, a claimant seeking to litigate an FCHR claim must obtain a reasonable cause determination from the FCHR or wait the requisite 180 days notwithstanding the claimant's receipt of the EEOC's Right to Sue letter. *Sheridan*, 182 So.3d at 793; *Sweeney*, 725 So.2d at 380-81; *Brewer*, 720 So.2d at 603-604.

Here, it is undisputed that on April 26,2016, claimant filed, for the first time, a Charge of Discrimination with the EEOC and the Connecticut Commission on Human Relations which would, if timely filed, properly investigated to a conclusion, and then relied upon to institute an action, constitute exhaustion of administrative remedies with respect to Claimant's Title VII claims. (Exhibit C.) Further, Claimant's Charge is currently pending and there has been no dismissal and notice of rights issued, and 180 days have not lapsed since the filing of the Charge. Thus, Claimant's allegations that the PCAP and termination by Cigna were motivated by either retaliatory intent or discriminatory intent, which remain under investigation by the EEOC, must be dismissed in this current litigation.

**C.    EVEN IF CLAIMANT HAD EXHAUSTED HER ADMINISTRATIVE REMEDIES   AND EVEN ASSUMING ALL DISPUTED MATERIAL FACTS IN FAVOR OF      CLAIMANT, SHE CANNOT POINT TO RECORD EVIDENCE THAT WOULD        SUPPORT HER CLAIMS AND ENTITLE HER TO JUDGMENT AGAINST    CIGNA.**

Even had Claimant exhausted her administrative remedies, she still cannot survive this motion for summary judgment. Claimant alleges that Cigna discriminated against her because of her national origin/race (Hispanic) by subjecting her to an unfair disciplinary process including subjecting her to a PCAP, requiring her to be subjected to gatekeeping as part of the PCAP and, ultimately, by terminating her employment. Claimant further alleges that the gatekeeping and the termination were done in retaliation for her complaint of "discrimination" to Karen King during her conversation on June 2, 2017.   However, Claimant cannot present facts to establish that Cigna's employment actions were taken for a discriminatory or retaliatory purpose.

In a case alleging employment discrimination, a claimant may prove her case either through direct or circumstantial evidence.   Direct evidence is evidence that, if believed, would prove the existence of a fact in issue without inference or presumption.   *Merritt v.*

*Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997). Circumstantial evidence is established through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, if Claimant can establish a *prima facie* case, the burden will shift to Cigna to present evidence that it had a legitimate, non-discriminatory reason for her termination. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). Upon such a showing, to survive this motion for summary adjudication, Claimant must establish that Cigna's proffered reasons are pretext for discrimination, by pointing to concrete evidence in the form of specific facts discrediting Cigna's proffered reasons for the challenged employment action. *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996). Importantly, "[t]he ultimate burden of persuasion remains on the Claimant to show that the defendant intentionally discriminated against [her]." *Alvarez*, 610 F.3d at 1264.

"[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Wilson v. B/E Aerospace, Inc.*. 376 F.3d 1079, 1086 (11th Cir. 2004). "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Id.* It is firmly established in the Eleventh Circuit that direct evidence requires "actions or statements of an employer [that] reflect[ ] a discriminatory or retaliatory attitude *correlating* to the discrimination or retaliation complained of by the employee." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (emphasis added). Here, Claimant complains she was terminated from Cigna based on her national origin / race, and therefore must proffer evidence, which if believed, proves without inference or presumption, (*Merritt*, 120 F.3d at 1189), that Cigna terminated her based on those protected characteristics. However, Claimant admits that she never heard and is not aware of

14

any such comments or evidence and therefore she must proceed by using the burden shifting paradigm. (Ex. B., p. 241.)

     **1.**    **Claimant Cannot Establish a *Prima Facie* Case of National Origin/ Race Discrimination.**

Thus, Claimant must rely upon circumstantial evidence to survive. To establish a *prima facie* case of national origin/race discrimination based on circumstantial evidence, Claimant must show that: (1) she is a member of a protected class; (2) she was subject to an adverse employment action; (3) she was qualified for the position held; (4) and she was replaced or treated less favorably than someone similarly situated outside of her protected class. *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003).

For purposes of this motion, Respondent does not dispute the first two elements of the standard. Claimant, however, cannot establish that she was qualified to do her job adequately (given the numerous documented performance issues she had in the last few months of her employment) or that she was treated less favorably than someone outside of her protected class who was similarly situated. In fact, she cannot present any evidence whatsoever of any similarly situated co-workers.

     **a.**    **Claimant Cannot Establish that She Was Qualified For the Position She Held at the Time of Her Termination.**

With respect to the third element, it is widely accepted that significant undisputed performance issues can establish that a plaintiff or claimant is not qualified for purposes of a *prima facie* case of discrimination. And, an arbitrator is authorized to "scrutinize the circumstances that existed at the time of termination in order to determine whether the Claimant is 'qualified' for purposes of demonstrating a *prima facie* case." *Robertson v. Home Depot (U.S.A.), Inc.*, 976 F.Supp. 1467,1473 (S.D. Fla. 1997) (citing *Holifield v. Reno*, 115 F. 3d 1555 (11th Cir. 1997), *aff'd*, 149 F.3d 1195 (11th Cir. 1998); *see also Boner v. Bd. of Comm'rs of Little Rock Mun. Water Works*, 674 F.2d 693, 696-97 (8th Cir. 1982) (affirming

15

lower court's finding that Respondent was not qualified due to his poor job performance); *Baas v. Guess?, Inc.*, 54 F. Supp. 2d 1105 (S.D. Fla. 1999) (finding that, where employer had been experiencing financial difficulty prompted by poor financial performance of stores and employer was displeased with the claimant's performance and the performance of her stores, claimant was not qualified for the position from which she was terminated). Given the undisputed evidence that Claimant continued to make performance based mistakes in her assignments, Claimant cannot satisfy the third element of the *prima facie* case.

**b.** **Claimant Cannot Present Any Evidence That a Similarly Situated Employee Outside of Her Protected Class Was Treated More Favorably Than She Was.**

Equally deficient in Claimant's *prima facie* case is the fact that she unable to identify a single comparator (of a different national origin) who was treated more favorably than her. To make a comparison of the plaintiff's treatment to that of non-Hispanic employees, the claimant must show that [s]he and the employees are similarly situated in all relevant respects. *Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *see also Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (comparators must "be nearly identical to prevent court's from second-guessing employers' reasonable decisions and confusing apples and oranges"); *TexasDep't of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981) (providing that "it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally"). While failing to identify a single comparator is not necessarily fatal to a Title VII action, to create a triable fact to survive summary judgment the Eleventh Circuit requires Claimant to "present[] a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Hamilton v. Sheridan Healthcorp Inc.*, 602 Fed. Appx. 485, 488 (11th Cir. 2015) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (affirming summary judgment where no comparator evidence could be presented); *Ingram v. Dealership Detailing Specialists, Inc.*,

16

No. 8:15-cv-1516-T-30AEP, 2016 WL 4441673, at **3-4 (M.D. Fla. August 23, 2016) (granting summary judgment in favor of employer where, although Respondent presented evidence of racist emails, Respondent could not identify a comparator).

In attempting to satisfy this burden, Plaintiff will likely attempt to point to her deposition testimony wherein she claims (without evidence) that two other ISRs – Kimberly Magaruh and Lauren Dopson both made Deductible ID errors around the same time she did and were not subject to discipline. (Ex. B., pp. 192-193.) Claimant testified that shortly after she was placed on a PCAP, she gained access to a list of ISRs who allegedly made Deductible ID errors between March and May, 2017 and saw these two names on the list. *Id.* However, even assuming her testimony is true for purposes of this motion only, Claimant also testified that she had no idea whether the alleged errors she saw a report were part of a situation at all similar to the circumstances that led to her PCAP. It is important to note here that her PCAP specifically notes two areas of concern that led up to the decision – 1) "Not validating Installation of accounts; Reliability and/or QA ticket on AON" and 2) Lack of personal accountability for business results." (Ex. B., p. 142, Ex. 32.)

In being questioned about any knowledge she had with respect to the "Deductible ID" errors made by Ms. Magaruh and Ms. Dopson, Claimant testified as follows:

Q.    Okay. What did it show?

A.    Those other two individuals made the same deductible errors.

…

Q.    You don't know, though, whether hers required a peer-to-peer review and three chances to get it corrected. Correct?

A.    Correct.

…

Q.    Do you know if [Kimberly Magaruh's] errors caused three chances to get them corrected and peer-to-peer reviews?

17

A.    I have no idea.

Q.    You have no idea.  Okay.  So you just know that they made some sort of deductible ID errors and that was that?

A.    (Nods head up and down)

Q.    Do you know what accounts the errors were made on; does it show in that report?

A.    I believe so.  It was one account.

Q.    For each of them?

A.    For each of them, uh-huh.

(Ex. B. pp. 194-195.)

Additionally, Ms. Ponton, the decision maker as to both the PCAP which included the requirement that Claimant be subjected to gatekeeping and the termination, testified in her declaration attached that neither of these incidents identified by Claimant required the ISR three opportunities to correct, continued errors on the same account, a significant impact to over 100 Cigna clients or a refusal by the ISR to be accountable for her missteps.  (Ex. A. ¶13)  Ms. Ponton also testifies that while supervising the ISR team, she has used the gatekeeping as a form of training in connection with a PCAP for two other individual ISRs, one of whom is Caucasian and the other of whom is African American. *Id.*  In Ms. Ponton's view, these other two PCAP situations were not caused by circumstances similar to those that Claimant presented.  Regardless, even assuming that the circumstances were similar (which Cigna does not admit), neither of those employees are Hispanic. *Id.*

Thus, Claimant's failure to identify any similarly situated employee who was treated more favorably mandates the dismissal of her claims. *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998) (affirming summary judgment for employer

18

where plaintiff failed to identify similarly-situated, non-minority employees who were treated more favorably because plaintiff bears burden of establishing *prima facie* case).

**2.     Claimant Cannot Establish a *Prima Facie* Case of Retaliation.**

Title VII prohibits an employer from retaliating against an employee because she "has opposed any practice made an unlawful employment practice by Title VII [or the FCRA or 42 U.S.C. §1981]." 42 U.S.C. § 2000e-3(a); *see* Fla. Stat. § 769.10(7); *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008) (retaliation claims are cognizable under 1981 if the plaintiff alleges retaliation for opposing race discrimination). To establish a *prima facie* case of retaliation, Claimant must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events. *Gupta v. Florida Bd. Of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). Ultimately, a Claimant making a retaliation claim under any of these statutes must establish that his or her protected activity was a *but-for* cause of the alleged adverse action by the employer. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534, 186 L.Ed. 2d 503 (2013); *Trigo v. City of Doral*, No. 13-24086-CIV, 2015 WL 11202636, at *5 (S.D. Fla. Sept. 30, 2015), *aff'd*, No. 15-14657, 2016 WL 6135233 (11th Cir. Oct. 21, 2016).

**a.     Claimant Did Not Engage in a Protected Expression.**

The pertinent allegation Claimant testified about regarding her alleged protected activity relate to Claimant's lone comment, during the speakeasy process investigating her complaints that her discipline was too harsh. In that comment, she allegedly stated that she felt that her supervisor was "discriminating" against her but also admits that she **never** expressed any belief that such discrimination was because of her national origin or race. *See, Supra*, p.p. 6-7.

It is clear within the 11th Circuit that, to sustain a cognizable claim of retaliation under the "opposition clause" of Title VII, a claimant's complaints must put supervisors on

19

notice that she is complaining about **prohibited** discriminatory conduct and that to do so, the Claimant must unequivocally allege **illegal** discrimination. *See, e.g., Gerard v. Board of Regents,* 324 F. App'x. 818, 826–27 (11th Cir. 2009) (letter that did not allege race discrimination could not form basis for retaliation claim); s*ee also Albrechtsen v. Board of Regents of Univ. of Wis. Sys.,* 309 F.3d 433, 436–437 (7th Cir. 2002) (letter that complained of mistreatment of all faculty members but did not contain words sex or gender could not have been construed as a complaint against sex discrimination). Stated differently, courts are unwilling to impose on employers the burden to deconstruct each employee grievance for possible unlawful discrimination. *See Blow v. Virginia Coll.,* 619 F. App'x 859, 864 (11th Cir. 2015) (emails that did not mention race or claim disparate treatment because of race did not constitute protected expression); s*ee Fox v. Eagle Distrib. Co., Inc.,* 510 F.3d 587, 591–92 (6th Cir.2007). As such, employee complaints of being "singled out" or "picked on" are not protected activity under Title VII. *See id.; Gerard,* at 826-827; *Griffin v. Neptune Tech. Grp.,* No. 2:14CV16-MHT, 2015 WL 1635939, at *8 (M.D. Ala. Apr. 13, 2015).

Under this well settled and applicable law, it is clear that Claimant's national origin / race neutral complaint of "discrimination" during the speakeasy process does not constitute protected activity under Title VII, the FCRA or 42 U.S.C. § 1981. Thus, her retaliation claims must be dismissed.

### b.   Claimant Cannot Establish a Causal Link.

Even if Claimant could establish that she engaged in protected activity, she also cannot present any evidence of a causal link between such activity and any adverse employment action. Fundamentally, a plaintiff seeking to establish a causal relationship to sustain a retaliation claim under an applicable FEP law must provide sufficient evidence of *knowledge* of the protected expression *and* that there was a *close temporal proximity* between this awareness and the adverse action. *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.

2004).

With respect to Complainant's comment during the Speakeasy process that she felt that she was discriminated against when she was disciplined, the undisputed record shows Claimant lodged her complaint on May 24, 2017, and was terminated July 27, 2017 – over two months later. The Eleventh Circuit has made clear that a multi-month disparity between the statutorily protected expression and the adverse employment action is not enough. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (collecting cases). "Thus, in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Id.* (citing *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir. 2004) (internal citation omitted).

Further, specific to Claimant's complaint to Karen King during the speakeasy process, which she made on May 24, 2017, the undisputed record shows that Ms. Ponton — the person who was charged with and executed the decision to terminate Claimant — did not know of that complaint when she executed her decision to terminate Claimant. There is no evidence whatsoever to impute the neutral discrimination complaint made to Ms. King onto Ms. Ponton. In such a case, the causal link cannot be established. *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir.1997) (analyzing Title VII retaliation claim and holding "[i]n a case involving a corporate defendant the Respondent must show that the corporate agent who took the adverse action was aware of the Respondent's protected expression "); *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (same). Accordingly, Claimant simply cannot connect the statutory protected expression (if it exists) as the "but for" cause of her termination and thus her retaliation claims fail as a matter of law.

### 3.   Cigna's Legitimate Reasons for Termination Defeat Each of Claimant's Claims.

Even if Claimant can establish a *prima facie* case for any of her claims (and she cannot), Cigna rebuts the inference of discrimination by articulating legitimate, non-discriminatory reasons for its actions. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Because a respondent need only produce, not prove, a non-discriminatory reason, this burden is "exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).   Cigna placed Claimant on a PCAP due to not validating installation of accounts / reliability and/or QA ticket on AON as well as Claimant's lack of personal accountability for business results. (Ex. A., ¶25.) Further, Cigna terminated Claimant because of her performance deficiencies and failure to meet the requirements of performance improvement efforts.  (Ex. A., ¶35.) Both of these reasons are legitimate non-discriminatory and non-retaliatory reasons for discipline.  *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1236 (11th Cir. 2004) (performance issues is a legitimate non-discriminatory reason); *Scott v. Fla. Dep't of Children & Family Servs.*, Case No. 3:04CV275/RV/EMT, 2005 U.S. Dist. LEXIS 19261, *16 (N.D. Fla. Sept. 6, 2005) (misconduct is a legitimate non-discriminatory reason).

### 4.   Claimant Cannot Establish Pretext.

In order to overcome an employer's articulation of a legitimate non-discriminatory or non-retaliatory reason once proffered, in order to survive a motion for summary judgment, a claimant must show that the respondent's reasons are pretext or untrue.  As shown *supra* in the governing standard, a claimant's burden to overcome a legitimate, non-discriminatory reason for their termination is a daunting evidentiary task, and one which—even upon the deferential review under Rule 56 for the non-moving party—is insurmountable for Claimant in this matter based on the undisputed record.

22

In analyzing a Claimant's burden to demonstrate prextext, the Eleventh Circuit has cautioned that "[courts] must be careful not to allow Title VII Respondents simply to litigate whether they are, in fact, good employees." *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). As such, "if the [employer's] proffered reason is one that might motivate a reasonable employer, a Claimant cannot recast the reason but must meet it head on and rebut it." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004). In doing so, the Claimant must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact-finder could find them unworthy of credence." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir.2005) (citation and quotation marks omitted). Further, to show pretext, a Claimant must show "*both* that the [proffered] was false, *and* that discrimination [or retaliation] was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (retaliation). Similarly, it is firmly established that it is not Claimant's or this Court's role to second-guess Cigna's personnel decisions. *See, e.g., Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991). Courts "are not in the business of adjudging whether employment decisions are prudent or fair, instead, [their] sole concern is whether unlawful discriminatory [or retaliatory] animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). Moreover, the inquiry into pretext centers on the employer's beliefs, not the employee's beliefs or "reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atlantic Developers*, 610 F.3d 1253, 1266 (11th Cir. 2010); *see Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) (inquiry is limited to whether employer *believed* employee was guilty of misconduct and if so, whether that was reason behind discharge).

23

Claimant cannot base her claims on the simple fact that she disagrees with Cigna's decisions, and her disagreement with those decisions does not render Cigna's stated reasons for Claimant's termination unworthy of credence or otherwise raise a genuine issue of fact. *See Cooper v. Southern Co.*, 390 F.3d 695, 738 (11th Cir. 2004). Rather, Claimant must present *evidence* that her termination was motivated by her membership in a protected class or was in retaliation to statutorily protected activity. *Cooper v. Southern*, 390 F.3d at 738.

Applying the undisputed record within the foregoing framework it is clear that Claimant cannot meet the burden she is faced with. Claimant has not and cannot point to any inconsistencies or evidence that the reasons proffered are false. Further, as discussed above, she can proffer no comparators or evidence that Cigna treated similarly situated employees outside of her protected class more favorably than it treated her. To do so, she must show that there were ISRs outside of her protected classes whose situations were "nearly identical" to her in all relevant respects (including both the repeated coding error **and** the refusal to take accountability and improve communication), and that Cigna treated those ISRs more favorably than it treated her. *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1317 (11th Cir. 2003); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1273 (11th Cir. 2004). This evidence simply does not exist and Claimant's naked allegations that another ISR made a Deductible ID error does not even come close to establishing the necessary similarities to her own situation so as to imply that Ms. Ponton's articulated reasons are biased because of national origin or in retaliation for a complaint of discrimination.

24

## IV.    CONCLUSION

For the reasons discussed above, Cigna respectfully requests entry of summary final judgment in its favor on all of the claims asserted in Claimant's Amended Complaint.

Respectfully submitted.

Date:    June 22, 2018

*/s/ Nancy A. Johnson*
Jeffrey B. Jones, Esquire
Florida Bar No.:  0039950
Email: jbjones@littler.com

Nancy A. Johnson, Esquire
Florida Bar No.:  0597562
Email: najohnson@littler.com

LITTLER MENDELSON, P.C.
111 North Magnolia Avenue
Suite 1250
Orlando, Florida 32801
Telephone:    407.393.2900
Facsimile:    407.393.2929

*Attorneys for Respondent*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on the following via email this 22nd day of June, 2017:

Glenda Perez
10158 Newminster Loop
Ruskin, FL 33573
Email: glendaperez52@yahoo.com

*/s/ Nancy A. Johnson*
Nancy A. Johnson
Attorney for Respondent

25

# EXHIBIT A

**IN THE MATTER OF THE ARBITRATION BETWEEN**

GLENDA PEREZ,

               Claimant,

    v.

CIGNA HEALTH & LIFE INSURANCE
CO.,

           Respondent.

Case No. 01-17-0004-5405

## DECLARATION OF VALERY PONTON

I, Valery Ponton do hereby swear, affirm and attest as follows, based upon my personal knowledge of the matters contained herein:

1.    I am over 18 years of age and competent to testify to the matters stated in this declaration. I make this declaration based upon my personal knowledge. This declaration is given voluntarily.

2.    I am currently employed by Cigna Health & Life Insurance Co. ("Cigna") as Operations Senior Specialist.

3.    I began working for Cigna approximately 12 1/2 years ago and have, over time, worked both on the pharmacy side of the business and the medical side of the business with customers addressing customer service issues, as a technical coach, a manager, and with clients.

4.    Cigna is a global health services organization that partners with clients (often corporate employers) to ensure that health goals of the clients are met particularly with respect to benefit offerings for employees. One type of health benefit plan that Cigna works with employers to provide for their employees is a pharmaceutical benefit plan. As part of being able to provide these pharmaceutical plans, Cigna employs Implementation Set-Up Representatives ("ISRs").

5.    In my current role, I am responsible for a team of ISRs who are responsible for coding computer programs to ensure that pharmaceutical benefit plans for Cigna clients and their employees (customers) are running. For example, we ensure that when a consumer of a prescription drug needs to fill his or her prescription, the pharmacy can apply the appropriate deductible for the consumer at the point of sale. The ISR

1

actually keys data into a computerized system that interfaces with pharmacies allowing those pharmacies to correctly charge their customers for their benefit plans.

6.    I moved into my current role in approximately April, 2016 at which time I began supervising approximately 20 ISRs including the Claimant in this litigation, Glenda Perez.

7.    Upon first taking over the management of my team, I learned that Ms. Perez had already been approved to begin working from home. She shortly thereafter moved to Florida with her family and worked remotely under my supervision. Upon taking over as her manager, I was aware that Ms. Perez had previously been on a verbal warning under Cigna's policies for excessive PTO, but that had fallen off and she appeared to be an average to slightly above average employee.

8.    As part of their jobs, ISRs reported to me but also worked closely with Heather Fago, known as a "tech coach" who has technical expertise in reviewing and implementing the coding needed to ensure that customers ultimately are able to use the benefit plans chosen by their employers. Ms. Fago works with me to assist the ISRs in understanding their job duties and ensuring that the ISRs have technical assistance and training as necessary to perform their jobs.

9.    I have never met Ms. Perez in person and cannot recall ever being aware of any biographical information about Ms. Perez that would reveal her national origin / race or ethnicity. As part of our working environment, we used an instant messenger service that populates a picture of my employees and I had seen a very small picture of Ms. Perez while working with her. In that picture, I could not identify any specific ethnicity or national origin of Ms. Perez and, until I was made aware of the allegations in this litigation, I believed that Ms. Perez was an American and Caucasian.

10.    As part of daily job duties, an ISR is assigned certain client accounts to work on and certain benefit plans for the client to update as new plans are added, taken away or updated according to client preference. Cigna also employs Pharmacy Implementation Managers (PIMs) – managers who are responsible for communicating client preferences and desires with respect to benefit plans. My team's assignments are made based upon the client's desires as communicated through the PIMs.

11.    In March, 2017, Ms. Perez was asked to work on a large client, AON. She was trusted to work on larger and sometimes more complex clients because of her tenure and the trust that I had in her at the time.

12.    After completing her work on AON, I soon learned that Ms. Perez had missed a very basic step that all ISRs were always taught to do when completing an assignment. The step she missed was akin to a firefighter putting on his safety jacket –

something so basic to an ISR who had been doing this for any period of time that there is no reminder necessary.

13.     After the mistake was made, Ms. Perez attempted to correct her error but made another basic error.  This step that Ms. Perez missed caused a change in the deductibles of pharmacy plans that were active for customers (employees) of about 38 AON accounts as well as impacting accounts for around 75 additional Cigna clients. This number was actually multiplied because most of those clients also had multiple pharmacy plan options for their employees.

14.     Upon learning of the errors she made on this account, I talked to Ms. Perez about fixing this error and reminded her of the impact of this error given the fact that it actually affected existing pharmacy plans of people negatively. I made clear that this was a significant issue.

15.     After consultation with Heather and the PIM on this account, Cigna determined that the best fix for this account here was to manually go into the accounts of each of the clients and force the system to redirect to the correct deductible for the customers.

16.     Although at first she did not seem to accept responsibility or accountability for getting this important account fixed, by the end of the call, I was confident that Ms. Perez understood the error and indicated that she knew the importance of fixing the error and that she knew how to fix it.  I was confident at the time that she knew how to fix this and that she knew enough to have not made the error in the first place.

17.     Unfortunately, I learned that even after this fix, there were still problems with the benefit plans that Ms. Perez had supposedly fixed.

18.     I spoke with Ms. Perez again after learning of the additional error and the continued problems with the AON benefit plans.  I recall that she admitted that she had now made another error.  I cannot recall exactly what the error was but recall that she had basically transposed numbers for several of the plans so that the customers would still not be properly charged when they tried to use their plans.  I recall specifically that Ms. Perez's response and attitude during this conversation was not what I expected as she was somewhat nonchalant about the second significant error that she made which compounded the first.

19.     My immediate concern upon learning this was to fix the problem for the client so that the client did not lose faith in Cigna.  Thus, I enlisted Glenda as well as several of her peers to assist in doing a deep audit on this account to ensure that there everything was properly fixed and up and running.

20. It took over a week of multiple team members' work to ensure that this account was customer ready and up to the quality standards that it should be.

21. The errors that Ms. Perez made with respect to this AON account were alarming to me. The different errors, in and of themselves, were not unheard of particularly by ISRs who were new to coding and were not done intentionally. However, the series of events and my interactions with Ms. Perez indicated to me that Ms. Perez was not engaged in her work. The initial errors she made are of the type that I very rarely see made by someone who has been coding for any period of time.

22. Typically new ISRs are only allowed to work on accounts that are being set up prior to a "live" date. That means that the ISR will set the account up and test it him or herself often weeks or days before the customers are actually covered under the new benefit plan. By restricting new ISRs to these types of accounts, an error like the one Ms. Perez made in the first place will have minimal impact and no impact on the customer. That type of mistake would be similar to a firefighter forgetting to put on his or her safety equipment – it becomes second nature to the employee who has experience but forgetting that step can cause serious problems.

23. The compounding error that Ms. Perez made is even more common than the initial errors. However, again, that mistake is made far more often with newer ISRs. Regardless, other than Ms. Perez, I do not recall ever having an ISR make this type of error on top of another error and acting nonchalantly when I talked to him or her about the error.

24. After the errors made on the AON account, I did attempt to engage in verbal counselling with Ms. Perez to address the seriousness of the mistakes. However, this did not seem to resonate and Ms. Perez continued to fail to take accountability for her actions. I also noticed that her communication with me on other work issues was deteriorating severely.

25. Thus, because of the errors made on the AON account as well as the interactions that I had with Ms. Perez that made me concerned that she was not fully engaged, I decided to place Ms. Perez on a Performance Corrective Action Plan ("PCAP"). I consulted with Employee Relations and was supported in this decision.

26. The PCAP is a process that I use that can be individually tailored to provide support, training and structure as needed. With Ms. Perez, I felt that I needed to understand what was at the root of her shift in attitude, effectiveness and accountability toward her job. Thus, as part of her PCAP, Ms. Perez was to use a "gatekeeping" system.

27. I had used a type of gatekeeping for other employees in the past to address other issues including gaps in training etc. However, this was the first time that I used a gatekeeping system in this exact manner because I was attempting to provide the best

4

coaching and counselling for this employee so that I could get the best work product back out of her.

28.   In my experience managing ISRs, I have used gatekeeping on two occasions other than with Ms. Perez. Both of those uses of gatekeeping were successful and the employees who had been subject to them progressed and were able to come off the PCAP. Of the two other occasions that I used a PCAP, neither employee had both the same performance issues (making careless mistakes that they should not be making at their level) along with the lack of communication / refusal to take accountability.

29.   During the conversation with Ms. Perez about beginning the PCAP, Ms. Perez told me that she was going to involve HR. I do not recall her using the word "discrimination" at all during that conversation.   I do remember that she was upset because she felt that it would be unfair that other ISRs would be able to see and know that she was on a PCAP.

30.   Shortly after that conversation, I was contacted by Karen King, an employee in Cigna's Employee Relations department (part of Cigna's HR department) who had been assigned to investigate Ms. Perez's concerns.

31.   During my conversations with Ms. Perez and Ms. King, I understood her concerns to be that she felt the PCAP was unnecessary and unfair. Ms. Perez felt that her mistakes were not that big of a deal and that she should not be accountable for the impact that mistakes had. She also felt that she did not need additional training.

32.   At no time during the HR investigation did I ever understand that Ms. Perez alleged discrimination of any kind and I certainly never understood that she made any complaint about being treated differently because of her national origin/ race or ethnicity. I did understand that she felt that she was treated differently because of the timing of her mistake – I know she felt that she was being used as an example because she made an error on an issue that we had just provided training on and she did not like the idea of going through gatekeeping.

33.   After working through this gatekeeping system for over a month, it was becoming apparent to me that Ms. Perez had more training gaps and issues with checking her work than I had realized. After monitoring every account that she worked on, it became apparent that the speed that she worked on accounts prior to this had been, at least partially due to the fact that she was not double checking all facets of the accounts she had been working on over the years – something that we were previously unaware of. Checking and "claims testing" the accounts before completing assignments is an integral part of what an ISR does and it appeared that Ms. Perez had only been doing a partial job.

34.     After making numerous attempts to address these alarming concerns and after continued issues with communications including communications about taking PTO, on approximately July 24th, I made the decision to seek guidance from Employee Relations as to whether they supported my decision to terminate Ms. Perez's employment.

35.     At this point, I knew that Ms. Perez had failed to live up to the terms of her PCAP by not taking accountability, not wanting to engage and understand the training that we were attempting to provide for her and not improving her communication with me and further efforts would not be effective. Thus, after being supported by HR and my manager, I made the final decision to terminate Ms. Perez's employment and did so effective July 27, 2017.

36.     After this litigation began, I learned of the allegations that Ms. Perez has made during this litigation including her allegation that other non-Hispanic ISRs had supposedly engaged in similar behaviors (the compounded errors) and were not treated similarly.

37.     Upon learning of these allegations, I undertook a search to confirm that I had not, in fact, treated any similar situation differently with respect to any other employee. I specifically looked at the records of performance errors of Lauren Dobson and Kimberly Magaruh because I learned that Ms. Perez had identified those two as ISRs that allegedly made errors similar to hers and who were not disciplined.

38.     While Ms. Dobson and Ms. Magaruh did make careless errors on accounts such as the original mistake Ms. Perez made on the AON account, their situations were completely different. The mistakes that I found which generated a "Reliability ticket" (a quality control measure to fix ISR errors) for either Ms. Dobson or Ms. Magaruh were both isolated incidents which were not compounded by multiple mistakes, did not affect multiple client accounts, did not require multiple attempts to fix and were not accompanied by an inability to be accountable for the mistakes.

39.     At no time did I take Ms. Perez's national origin, race or ethnicity into account when making the decisions to place her on the PCAP or to terminate her employment.

40.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 22nd day of June, 2018.

　　　　　　　　　　　　　　　　　　　　/s/ Valery Ponton
　　　　　　　　　　　　　　　　　　　　Valery Ponton

6

# EXHIBIT B

1

1        IN THE MATTER OF THE ARBITRATION BETWEEN

2

3                   CASE NO.: 01-17-0004-5405

4
    GLENDA PEREZ,
5
              Claimant,
6
    vs.
7
    CIGNA HEALTH & LIFE
8    INSURANCE CO.,

9              Respondent.
    _____/
10

11

12                   April 12, 2018
                     10:44 o'clock a.m.
13

14        The deposition of GLENDA PEREZ,

15    taken pursuant to Notice on behalf of the

16    Respondent, at the offices of Littler Mendelson,

17    P.C., 111 North Magnolia Avenue, Suite 1250,

18    Orlando Florida, before Barbara G. Perry,

19    Registered Professional Reporter, Florida

20    Professional Reporter and Notary Public, in and

21    for the State of Florida at Large.

22

23

24

25

1    generally what your -- other than that portion of

2    your responsibilities, what your responsibilities

3    were?

4         A.   As far as my -- what my job role consisted

5    of?

6         Q.   Yes.  Yes.

7         A.   Implementing, building, structuring pharmacy

8    plan benefits.  Doing auditing work.

9    Completing transaction files.  Going over suspense

10   files.  Mentoring new hires.  Sometimes I'd be given

11   projects.

12             That's what I can remember right now.

13        Q.   Okay.  How were you assigned job duties, how

14   were you assigned projects or how did you know what

15   to do every day?

16        A.   We would receive an Excel spreadsheet and

17   any of the accounts on there, if your name was

18   attached to it, that's what you were assigned.

19             The way they divided it, they did it by

20   months.  So any accounts that needed to be structured

21   or had an effective date of a certain month, it would

22   be on one tab, you know, and then the next and the

23   next.

24             And then they would have a special tab for

25   any suspense that needs to be looked at, any work in

40

1    progress accounts.  Along with any QA ticket, or

2    Quality Audit Tickets if you had any.

3        Q.   So, if you receive the Excel spreadsheet,

4    that only had your assignments on it, or was it for

5    all people in the same role as you?

6        A.   All people.

7        Q.   And how often did you receive those

8    spreadsheets?

9        A.   Every day.

10       Q.   Every day.  Were they fairly consistent?

11   I'm assuming you might have one client and it's not

12   going to go away, like you don't take care of an

13   entire account in one day.  Correct?

14       A.   We had to finish it in one day.

15       Q.   So if your name is on it that day, you

16   finish it that day?

17       A.   Yes.

18       Q.   Did it ever take you more than one day for

19   things?

20       A.   Yes.  Sometimes.

21       Q.   Then what do you do when that happens?

22       A.   Most of the time when that happens it's

23   because it needs additional coding that goes outside

24   to a different vendor.

25            And when it goes out to a different vendor,

1   it takes about 14 days for their side to be completed

2   and then it gets sent over to us saying it's been

3   done.

4           You have to make some claim checks to make

5   sure that their coding is right.  And if everything

6   looks right and good, then we would send it off to a

7   Quality Department and then it would come off.

8       Q.   Then it would come off your chart?

9       A.   Yes.  As completed.

10      Q.   So if your name is next to an account for a

11  certain day, what specifically do you do then, how do

12  you know what to do?

13      A.   I open the account and I would just go down

14  and write down the Benefit Option, the company name,

15  the account, what type of benefits they were looking

16  for.  Look at their deductibles.  And any additional

17  coding that they wanted.

18          Some accounts can have five Benopts.

19  Benefit Options, we call them B-E-N-O-P-T-S.  It's

20  short for Benefit Options.  And some accounts would

21  have 20 Benefit Options.  So it all depended on the

22  account.

23      Q.   Sure.

24      A.   Not one account was the same, it was all

25  different.  So it all depended.

42

1     Q.   So on the spreadsheets it would have like

2    the name of a company.  Correct?

3     A.   Yes.

4     Q.   And then you were dealing with just like the

5    -- is it just the pharmacy benefits for their

6    employees?

7     A.   Yes.

8     Q.   For that company's employees?

9     A.   Yes.

10     Q.   So are you physically going in and you are

11    responsible for making sure that all of the options

12    there are the options that that company wants to

13    provide for its employees as far as pharmacy

14    benefits?

15     A.   Right.  And then I structure them.

16     Q.   And so an option might be that co-pays are

17    certain amounts.  Correct?

18     A.   Yes.

19     Q.   Or it might be that the employee is

20    responsible for up to a certain deductible amount?

21     A.   Yes.

22     Q.   Or there might be no deductible?

23     A.   Right.

24     Q.   Something like that?

25     A.   Yes.

1      Q.   And how do you know what the company wants

2  if you're assigned to an account, is there a separate

3  email for that company, is it in the system; how do

4  you know you're making sure it's correct in their

5  account.

6      A.   It's listed in the account itself.

7  They call it Epro.  Anything in there is what they

8  want, so those are the things that I jot down.

9      Q.   So Epro is a system that's on the computer

10 that you are given basic numbers, right?

11     A.   Yes.

12     Q.   So you have access to get on to Epro?

13     A.   Yes.

14     Q.   You list the account that you got from your

15 spreadsheet and say, okay, this person is assigned to

16 this company.  You pull that company's name off of

17 Epro.  Correct?

18     A.   Yes.

19     Q.   And in Epro, it shows that they have a new

20 pharmacy plan and we want A, B, C, D, E.  How does

21 that show up; is it on different screens, how?

22     A.   It's complex.  It's more you have to know

23 what you're looking for, because there are other

24 things listed in there that don't pertain to you or

25 don't pertain to any type of coding.

1           So it's -- it's kind of hard to explain, but
2    it's pretty much, we're looking for their co-pay
3    structure, their clinical management, how many tiers
4    they want, versus three tiers or four tiers, the type
5    of buy-outs, smoking citation, vitamin buy-outs.
6       Q.   So you know what you are looking for?
7       A.   Yes.
8       Q.   And that information is all somewhere within
9    that email for?
10      A.   Right.
11      Q.   Or multiple screens, whatever, for that
12   client?
13      A.   Yes.
14      Q.   When you look it up, you have to like write
15   it down and then go to a different system to make
16   sure it's in their plan?
17      A.   Yes.
18      Q.   What's the system you go into to implement?
19      A.   We go to VFOS, V as in Victor, F as in
20   Frank, O, S as in Sam.  And that stands for Vendor F
21   Online System.
22           When we plug in the account number,
23   everything for that account comes up.  The Benefit
24   Options, the year that it was effective, the client
25   ID, the coverage code, if there is a deductible.

1          And based off if they have a client ID and a

2   coverage code listed already, I'll plug that into a

3   different system and it will tell me exactly what

4   they have.

5          Q.   What they already have?

6          A.   What they already have.

7          Q.   So that's for an existing client --

8          A.   Yes.

9          Q.   -- that's already been using Cigna for their

10  benefits?

11         A.   Yes.

12         Q.   Were there times when you had brand-new

13  clients, too, and you had to populate everything?

14         A.   Yes.

15         Q.   So, even if it was already there, was it

16  your responsibility to make sure they were accurate?

17         A.   Yes.

18         Q.   And if it's a new client, you are

19  responsible to put everything in accurately?

20         A.   Yes.  And if they wanted anything updated,

21  we had to make sure that there were client specific

22  coverage codes and client IDs, which means cannot be

23  shared, so it just pertains to that account only, and

24  then you would just go in and look at updates.

25         Q.   Okay.  If it's not client specific and you

1   make a change, does it affect other accounts?

2        A.   Absolutely.

3        Q.   Kind of part of why we are here today.

4   Right?

5        A.   Okay.

6        Q.   So how much of your time in any day did you

7   spend either updating new accounts, confirming old

8   accounts, confirming this client I have been assigned

9   to, I've got all this right in the VFOS system; how

10  much of your day was taken up doing that?  On

11  average.  I know it varied.

12       A.   Depending on how many accounts I have.

13  But if I'm working on one, I check it from A to Z.

14  I don't rush.

15       Q.   Maybe my question was poor.  Like you

16  listed, you know, implementing, structuring,

17  auditing, special projects, mentoring new hires,

18  things like that.

19            Was 50 percent of your time usually just

20  working on the accounts and 50 percent was other

21  stuff, was 90 percent of your time normally doing

22  these plans and making sure everything was accurate

23  and then 10 percent was the mentoring and the

24  projects and stuff?  That's what I'm looking for,

25  sort of how much was the actual going into the plan

1      A.   Most of these courses I just took on my own
2  when we had downtime.
3      Q.   So everything on there looks like something
4  you went through in those trainings?
5      A.   Yes.
6      (The document was marked for identification as
7  Perez Exhibit No. 3.)
8  BY MS. JOHNSON:
9      Q.   The next thing I'm going to show you is
10  Exhibit 3.  Which, for the record, I should be doing
11  this.
12          Exhibit 3 is Perez 1666 and 1667.  And, 2,
13  for the record was, Perez 1593?
14          We can find these again.  I will put, Perez
15  1 was Perez 1592.
16          Take a look at Exhibit 3 that I handed to
17  you.  Does that look familiar to you?
18      A.   (Reviews document)  Yes.
19      Q.   Is that the Equal Employment Opportunity
20  Policy that was in effect, at least as of June 2014
21  and on while you were employed with Cigna?
22      A.   I know there's been changes or an updated
23  version, but everything that I -- I'm reading is the
24  same with the new version that they have.
25      Q.   So the contents are familiar to you --

1        A.   Yes.

2        Q.   -- from the policy that was there?

3        A.   Yes.

4        Q.   You think there may have been an updated one

5   at some point while you were there, but the contents

6   are the same?

7        A.   Yes.

8        (The document was marked for identification as

9   Perez Exhibit No. 4.)

10  BY MS. JOHNSON:

11       Q.   I'm going to hand you Exhibit 4, which is

12  Bates-Stamped Perez 1658 and 1659.

13       A.   (Reviews document)  Yes.

14       Q.   Is that Policy familiar to you --

15       A.   Yes.

16       Q.   -- from the Harassment Avoidance Policy that

17  Cigna has?  And the one that I handed you, is this

18  the version that was implemented in October 2016?

19       A.   Yes.

20       Q.   Was there a similar policy prior to October

21  2016 that you're aware of?

22       A.   No.  I didn't look at anything.  I just saw

23  the most recent one that they had online.

24       Q.   Got it.  So you were familiar with this one?

25       A.   Yes.